# IN THE COURT OF APPEALS OF IOWA

No. 18-1223
Filed December 5, 2018

**IN THE INTEREST OF V.L.,**
**Minor Child,**

**L.O., Intervenor,**
        Appellant.

_____

Appeal from the Iowa District Court for Polk County, Joseph W. Seidlin, District Associate Judge.

A temporary custodian appeals a joint permanency and termination order transferring custody and guardianship of her niece to the department of human services.  The State moved to dismiss.  **MOTION TO DISMISS OVERRULED; JUDGMENT AFFIRMED.**

Frank Steinbach of McEnroe, Gotsdiner, Brewer, Steinbach & Rothman, P.C., West Des Moines, for appellant intervenor.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Kayla Stratton of Juvenile Public Defender Office, Des Moines, guardian ad litem for minor child.

Considered by Tabor, P.J., and Mullins and Bower, JJ.

**TABOR, Presiding Judge.**

For more than a year, V.L. lived with her great aunt Linda.[1]  The State recruited Linda as a temporary custodian after removing V.L. from her mother's care.  By all accounts, both Linda and V.L. enjoyed their time together.  In Linda's words: "I know I brought a lot to her life, but on the other hand, she's brought a lot to my life."  The child's guardian ad litem described V.L.'s influence on Linda as "an Indian summer"—brightening the great aunt's life.

While lauding the "love and care" Linda provided V.L., the juvenile court transferred V.L.'s custody and guardianship to the Iowa Department of Human Services (DHS) following a joint permanency and termination-of-parental-rights (TPR) hearing.[2]  Linda now seeks reversal of that transfer order.  Pointing to their strong bond, Linda argues remaining in her custody serves V.L.'s best interests.  As a sub-issue, Linda complains the juvenile court failed to consider her medical-records exhibit to rebut the DHS claim that her health conditions limited her ability to provide long-term care for V.L.  Linda also contests the juvenile court's denial of her motion for new trial alleging newly discovered evidence.  The motion flagged a recently completed home study recommending Linda as an adoptive parent for V.L., who turned three in August.

As our first order of business, we must address the State's motion to dismiss.[3]  The State insists Linda intervened only in the child-in-need-of-assistance

---

[1] According to the adoption study, V.L.'s mother, Jamie, is the granddaughter of Linda's brother—making Linda the child's great great aunt.  For ease of reference, we will refer to Linda as V.L.'s great aunt throughout this opinion.

[2] To begin, the juvenile court terminated the parental rights of V.L.'s mother and father.  Neither parent appeals.  And Linda does not challenge the termination.

[3] Our supreme court ordered the State's motion and Linda's resistance be submitted with the appeal.

(CINA) case and the permanency order she now challenges is not a final appealable order. The State also contends the termination order rendered moot any issues from the CINA permanency proceedings.

For the reasons outlined below, we decline to dismiss the appeal as interlocutory. But after our independent review of the facts and law, we affirm the juvenile court's order transferring V.L.'s guardianship and custody to the DHS under Iowa Code section 232.117(3)(a) (2017).

## I.      Facts and Prior Proceedings

V.L. was not yet two years old when the DHS removed her from the care of her mother Jamie, who was using crack cocaine. In May 2017, Linda agreed to be V.L.'s temporary custodian. Linda had also raised Jamie and her siblings when the State removed them from their parents. Although she did not adopt them, she served as their legal guardian.

Our record contains conflicting information about Linda's initial willingness to adopt V.L. The DHS worker testified that at the time of removal, Linda expressed reservations about being the "concurrent plan" if V.L. could not reunify with Jamie but agreed to temporary custody to "help Jamie out." By contrast, Linda testified: "I said from day one I would adopt her."

After their daughter's removal, Jamie did not meet DHS expectations and V.L.'s father had little involvement in the CINA proceedings. In early December 2017, the juvenile court issued a CINA review order, noting DHS had decided Linda was "not a concurrent plan for the child." The court expected "to hear evidence regarding long-term placement of the child" at a permanency hearing in February 2018. A few days later, the State petitioned to terminate the parents'

rights. The State's petition noted V.L. was currently in Linda's custody under DHS supervision. *See* Iowa Code § 232.111(4)(b)(3). In response, the juvenile court set a date for a joint permanency and termination hearing, directing Linda be served notice in accordance with the "statutory guidelines." *See* Iowa Code § 232.112(1) (listing "necessary parties" in termination case).

Then in late December 2017, Linda moved to intervene in the CINA case, seeking permanent custody of V.L. The juvenile court granted her motion to intervene despite resistance from the State and guardian ad litem (GAL).[4]

Linda appeared with her attorney at the joint permanency and termination hearings in April and May 2018. By that time, V.L. had been in Linda's care for almost one year. Linda, who was then sixty-two years old, testified she wanted to be V.L.'s long-term caretaker and felt physically able to do so. The State and GAL questioned Linda at length about her health conditions—which included fused disks in her back, diabetes, asthma, high blood pressure, high cholesterol, bursitis in her hip, and chronic depression and anxiety.[5]

---

[4] The court believed Linda deserved to have her position heard:
> I'm going to grant the petition to intervene.
>
> . . . The issue is whether or not there is an adequate representation of [Linda's] interests by the mother.
>
> Maybe at the moment, their interests are the same in that they wish [Linda] to be considered as the concurrent plan, but that may be fluid, and if that changes, for instance at permanency or the TPR hearing, then I'm sure the argument would be—if there was a seeking of intervention at that point in time, would be intervention would be untimely.
>
> So can't be putting her between a rock and a hard place or a catch twenty-two or whatever other phrase you want to put in there. These situations are fluid, and certainly she has a right to be heard. So I'm going to grant the intervention.

[5] Linda did not work, but received disability benefits.

The DHS caseworker testified that she was not recommending Linda as the long-term placement for V.L. based largely on concerns she would not be physically able to care for the child.[6] The caseworker instead recommended V.L. be placed with a paternal great aunt and uncle who had other young children in their home.

At the hearing, the State urged the court to transfer V.L.'s custody and guardianship to DHS for determination of a permanent placement following termination. The DHS had asked the Four Oaks agency to conduct a preadoption home study for Linda, but it was not complete in time for the hearings. Linda's attorney called the adoption specialist to testify but she was unable to share her recommendation until the report was complete.

In June 2018 the juvenile court issued a permanency and termination order. In addition to terminating parental rights,[7] the court transferred guardianship and custody of V.L. to DHS under section 232.117(3)(a). The court held "DHS is in the best position to sort out potential adoptive homes and find one that is in the child's best interests, whether that home be with Linda, another relative, or with someone else."

After the order issued, the DHS released the Four Oaks study recommending Linda as an adoptive parent. The report acknowledged Linda had some physical limitations but highlighted the nurturing home environment Linda provided for V.L. Linda moved for new trial citing the study's recommendation as

---

[6] The court-appointed special advocate (CASA) also questioned Linda's physical ability to care for V.L. in the long term.
[7] Jamie consented to termination of her parental rights. The court decided the father has abandoned V.L.

newly discovered evidence that would have changed the outcome of the hearing. The court denied the motion. Linda filed a notice of appeal.

## II.     Scope and Standards of Review

We generally review CINA and termination-of-parental-rights proceedings de novo. *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014). In doing so, we consider both the facts and the law anew when adjudicating the parties' rights. *Id.* But if the issue raised requires statutory interpretation, we review for correction of legal error. *Id.* We review subsidiary rulings, like those involving the admission of evidence, for an abuse of discretion. *In re L.R.*, No. 13-0713, 2013 WL 4504930, at *6 (Iowa Ct. App. Aug. 21, 2013). We also review the denial of a motion for a new trial for an abuse of discretion. *In re K.R.*, 737 N.W.2d 321, 323 (Iowa Ct. App. 2007).

Regardless of the standard of review, our fundamental concern remains the child's best interests. *J.C.*, 857 N.W.2d at 500.

## III.    Motion to Dismiss

The State moved to dismiss Linda's appeal arguing (1) she only intervened in the CINA case and (2) the CINA permanency ruling was not an appealable final order. The State cites *In re T.R.*, where our supreme court reiterated that "[l]ike appeals from all other orders, right of appeal [in CINA proceedings] depends on whether a juvenile court order is 'final.'" 705 N.W.2d 6, 9 (Iowa 2005) (quoting *In re W.D.*, 562 N.W.2d 183, 185 (Iowa 1997)); *see also* Iowa R. App. P. 6.103(1). In both *T.R.* and *W.D.*, the permanency orders directed the State to file a petition to terminate parental rights. *See* 705 N.W.2d at 8; 562 N.W.2d at 184. Directing a termination petition be filed does not dispose of the child-welfare issue. *See In*

*re A.C.*, 443 N.W.2d 732, 733 (Iowa Ct. App. 1989) (warning "an appeal could unduly delay the termination which is essential to the welfare of the child"). Permanency orders in a CINA proceeding that anticipate the opening of a termination case carry no finality.

Not so here. The juvenile court issued a single order in V.L.'s case, simultaneously ending both the CINA and termination proceedings. The order was not interlocutory because it finally adjudicated V.L.'s guardianship and custody under section 232.117(3). This appeal posed no danger of delaying permanency for V.L. The cases of *T.R.*, *W.D.*, and *A.C.* are not controlling.

We turn next to Linda's standing to challenge the juvenile court's transfer of custody and guardianship to the DHS. The State argues Linda cannot appeal from the termination order because she did not intervene in the termination proceedings. It is true Linda sought to intervene only in the CINA case. But by the time she did so, the State had already filed its termination petition. And the district court provided her notice of the joint permanency and termination hearing as a "necessary party" under section 232.112(1). *See J.C.*, 857 N.W.2d at 506 (explaining "[j]uvenile courts clearly have the authority to make the factual determination of whether a person qualifies as a necessary party").

Even more to the point, the fact Linda intervened only in the CINA case did not stop the juvenile court from resolving Linda's request for custody or guardianship.[8] Indeed in its discussion, the court noted, "Linda has not sought to intervene in the termination proceedings" but continued to analyze whether she

---

[8] We look beyond the form of a petition to the substance. *IES Utils. Inc. v. Iowa Dep't of Revenue & Fin.*, 545 N.W.2d 536, 542 (Iowa 1996).

was a "suitable person" to serve as a custodian under section 232.117(3). *See In re C.L.C.*, 479 N.W.2d 340, 343 (Iowa Ct. App. 1991) (discussing who may qualify as "suitable persons" under section 232.117(3) following termination of the parental rights). The court went on to say, "[R]egardless of her legal status in the termination proceeding, the court has fully considered her in making its choice as to guardianship and custody."

Linda did not have to intervene in the termination case to have her claim heard when she had already intervened in the CINA case and the juvenile court combined the proceedings. *See In re Adkins*, 298 N.W.2d 273, 277 (Iowa 1980) (recognizing CINA and termination proceedings "are not separate and distinct actions, but are interdependent and interwoven"). All parties were aware Linda wanted to remain V.L.'s custodian. Linda appeared for the joint permanency and termination hearing and gave the bulk of the testimony. The issue of long-term placement for V.L. was on the table. The court rejected Linda's bid to be the custodian for V.L. before the adoption stage. *See C.L.C.,* 479 N.W.2d at 343. She is entitled to challenge that rejection on appeal. *See id.*

In a final push for dismissal, the State contends Linda's issues from the CINA case are moot after termination.[9] The State cites *In re JC*, where parents appealed dispositional orders after the termination-of-parental-rights proceedings. No. 11-0002, 2011 WL 648939, at *3 n.1 (Iowa Ct. App. Feb. 23, 2011). Generally,

---

[9] If the State were correct in moving to dismiss, Linda's claims would be simultaneously not final, as arising from the CINA permanency order, and moot, because of the finality of the termination order. Thus, she would have no chance to be heard on her interest in continuing as V.L.'s custodian.

"an appeal is moot if the 'issue becomes nonexistent or academic and, consequently, no longer involves a justiciable controversy.'" *In re D.H.*, 902 N.W.2d 584, 586 (Iowa Ct. App. 2017) (citation omitted). "'The test is whether the court's opinion would be of force or effect in the underlying controversy.'" *Id.* (citation omitted). The question of V.L.'s post-termination, preadoption custody decided in the joint permanency and termination order is not moot. The court chose to transfer custody to DHS. It is not a nonexistent or academic issue whether this transfer was in the child's best interests. We decline to dismiss on mootness grounds.

Having rejected the State's grounds for dismissal, we turn to the merits of Linda's appeal.

## IV. Preadoption Custody and Guardianship

In determining the proper transfer of guardianship and custody after termination of parental rights, the court looks to the child's best interests. *See In re A.S.*, 906 N.W.2d 467, 477–78 (Iowa 2018). At this stage, "there is no statutory preference for placement with a relative." *Id.* at 477; *see In re N.V.*, 877 N.W.2d 146, 150 (Iowa Ct. App. 2016).

Rejecting Linda's position, the juvenile court viewed the DHS as its "clear choice" for V.L.'s post-termination, preadoption placement. *See* Iowa Code § 232.117(3). That statute allows the court to choose among three options (1) the DHS; (2) a suitable private agency; or (3) a parent who does not have physical care of the child, other relative, or other suitable person. Here, the juvenile court picked the DHS because the state agency was in the best position to identify which potential adoptive home would be in V.L.'s best interest. *See N.V.*, 877 N.W.2d at

150 (examining reasonableness of current guardian's actions and child's best interests when deciding post-termination placement). The juvenile court did not rule out the possibility that Linda could provide that adoptive home. In fact, the court expressed its appreciation for the bond Linda created with V.L. But the court emphasized it must look to the child's long-range, as well as immediate interests. *See In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981).

In our de novo review, we reach the same conclusion as the juvenile court. Linda admirably stepped up when V.L. was in need and offered valuable stability and love for the child. But the DHS should weigh all placement options when deciding what adoptive home would be in V.L.'s best interest in the long run. Linda or other relatives may seek to adopt V.L. But the DHS will determine the appropriate adoptive parents. *See A.S.*, 906 N.W.2d at 478.

In a related evidentiary issue, Linda contends the juvenile court failed by not listing an offered exhibit of her treatment records from Broadlawns Medical Center as submitted at trial. In the ruling, the court observed: "Much reference was made by both the State and Linda to a record from a medical exam from a few months ago that outlines Linda's various ailments, treatments and compliance with treatment, although that record was not offered into evidence." On appeal, Linda contends the court should have construed the wording of the county attorney's offer of the State's exhibits at the beginning of the trial as including an offer of the intervenor's exhibit. Linda argues the exhibit was material to the permanency issue because it showed her willingness to visit doctors and control her chronic health issues.

Even if the juvenile court should have treated the intervenor's exhibit as admitted evidence, any error was harmless. Linda had the chance to discuss the medical records during her testimony. When the county attorney presented the five-page exhibit to Linda on the witness stand, she responded: "I don't understand half of this, you know. I did go there and get a physical." Linda went on to answer questions about her chronic pain and prescribed medications. When examined by her own attorney, Linda told the court that in her doctor's opinion "none of these issues stops me from taking care of the baby." The court referenced that testimony in its ruling. The absence of the medical-record exhibit had no meaningful effect on the court's consideration of Linda's position. See *State v. Moore*, 251 N.W. 737, 743 (Iowa 1933) (finding exclusion of exhibits was not error demanding a reversal because defendants presented same information by the oral testimony of witnesses).

## V. Denial of Motion for New Trial

Finally, Linda contends the juvenile court erred in denying her motion for new trial. She moved for a new trial following the release of the Four Oaks preadoption home study recommending her as an adoptive parent. The court denied the motion because

> [t]hat evidence is neither material, nor newly discovered. The court and parties were fully aware of the existence of a pending home study from the evidence presented. A party could have asked for, and/or the court could have chosen to leave the record open for receipt of that completed home study. That did not happen. More importantly, the existence or not of an approved adoption home study for [Linda] was not the deciding factor in the court's decision to terminate parental rights and place guardianship and custody with DHS. The court based its decision on the . . . findings and conclusions set forth in its ruling . . . .
> . . . .

Evidence of a now-approved homestudy would not change any of the court's findings or conclusions.

Iowa Rule of Civil Procedure 1.1004(7) allows a party to obtain a new trial if "[m]aterial evidence, newly discovered, which could not with reasonable diligence have been discovered and produced at trial" "materially affected [the party's] substantial rights." The phrase "newly discovered" means the evidence existed at the time of trial but for a justifiable reason the party did not produce it. *In re D.W.*, 385 N.W.2d 570, 583 (Iowa 1986). Courts have recognized an exception to this rule in extraordinary situations. *See Benson v. Richardson*, 537 N.W.2d 748, 763 (Iowa 1995). If the evidence did not exist at the time of trial, the court must consider it if otherwise an "utter failure of justice will unequivocally result" or "it is no longer just or equitable to enforce the prior judgment." *Id.*

Here, Linda acknowledges the final Four Oaks report did not exist at the time of the trial. But we need not decide if this case is so extraordinary that it triggers the exception. *See D.W.*, 385 N.W.2d at 584–85. Her motion fails on another ground. As the juvenile court held, the final preadoptive study was unlikely to change its decision to transfer custody and guardianship to the DHS. *See id.*

The Four Oaks worker testified about her visit to Linda's home and assessment of her physical abilities. The information in the final report was similar. The worker noted Linda's back condition did not prevent her from being active with V.L., but the worker observed it "rather limited her strength of what she can and can't lift." Although the worker ultimately recommended Linda as an adoptive parent, she noted Linda would struggle as she ages to keep up with V.L. The Four Oaks recommendations were not binding on the DHS in deciding which adoptive

home would be in V.L.'s best interests.  The availability of the preadoptive study was not material to the juvenile court's transfer decision.  The juvenile court properly denied the motion for new trial.

**MOTION TO DISMISS OVERRULED; JUDGMENT AFFIRMED.**